15 CV 00811

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| DEVORAH KLEIN, Individually and on Behalf of All Others Similarly Situated, | : : : |
| Plaintiff(s), | : : |
| v. | : : : |
| ALIBABA GROUP HOLDING LIMITED, JACK YUN MA, JOSEPH C. TSAI, JONATHAN ZHAOXI LU and MAGGIE WEI WU, | : : : : : |
| Defendants. | : : |

Case No.

CLASS ACTION

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

DEMAND FOR JURY TRIAL

RECEIVED
FEB 03 2015
U.S.D.C. S.D. N.Y.
CASHIERS

Plaintiff, Devorah Klein, individually and on behalf of all others similarly situated, by plaintiff's undersigned attorneys, for plaintiff's complaint against defendants, alleges the following based upon personal knowledge as to plaintiff and plaintiff's own acts, and upon information and belief as to all other matters based on the investigation conducted by and through plaintiff's attorneys, which included, among other things, a review of Securities and Exchange Commission ("SEC") filings by Alibaba Group Holding Limited ("Alibaba" or the "Company"), as well as media reports about the Company and Company press releases. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.    This is a securities class action on behalf of all persons who purchased or otherwise acquired the securities of Alibaba between October 21, 2014 and January 28, 2015, inclusive (the

"Class Period"), against Alibaba and certain of its officers and/or directors for violations of the Securities Exchange Act of 1934 ("1934 Act").

2.      Defendant Alibaba is a China-based online and mobile commerce company in retail and wholesale trade, as well as cloud computing and other services. Alibaba represents that it is "the largest online and mobile commerce company in the world in terms of gross merchandise volume" in 2013. The Company hosts an online sales platform for third parties and does not engage in any direct sales, compete with merchants or hold inventory.

3.      During the Class Period, Defendants issued materially false and misleading statements regarding the soundness of the Company's business operations, the strength of its financial prospects and concealing substantial ongoing regulatory scrutiny. Specifically, Alibaba failed to disclose that Company executives had met with China's State Administration of Industry and Commerce ("SAIC") in July 2014, just two months before Alibaba's $25+ billion initial public offering in the United States (the "IPO"), and that regulators had then brought to Alibaba's attention a variety of highly dubious – even illegal – business practices that the SAIC advised Alibaba it was then actively clamping down on and which threatened the core of Alibaba's business, including:

- The rampant sale of counterfeit goods, including fake cigarettes, alcohol and branded handbags, by vendors on Alibaba's third-party marketplace platform;

- The sale of restricted weapons and other forbidden items on Alibaba's third-party marketplace platform;

- That Alibaba staffers had taken bribes from merchants and others seeking help to boost their search rankings and to get advertising space;

- That Alibaba ignored the practice by some vendors of faking transactions to make their sales volumes appear higher;
- That Company officials did nothing to stop merchants from using tactics such as false and misleading advertising; and

- Accused Alibaba of alleged anticompetitive behavior such as forbidding merchants to participate in rival sites' promotions.

4.      Prior to the disclosure of the adverse facts detailed above, Alibaba and certain "selling shareholders" sold more than 368 million American Depositary Shares ("ADSs") in the IPO at $68 each, raising more than $25 billion. Selling shareholders included two of Alibaba's co-founders, Executive Chairman of the Board Jack Yun Ma ("Ma"), who sold more than 12.75 million shares, and Vice Chairman of the Board Joseph C. Tsai ("Tsai"), who sold another more than 4.25 million shares. Throughout the Class Period, Alibaba's ADSs continued trading at ever-increasing, artificially inflated prices reaching a Class Period high of $120 each in intraday trading on November 13, 2014.

5.      On January 28, 2015, before the opening of trading, various members of the financial media reported that SAIC, China's main corporate regulator, had released a white paper accusing Alibaba of engaging in the very illegal conduct disclosed to Alibaba executives in July 2014.

6.      On this news, the price of Alibaba ADSs dropped 4%, or $4.49 per ADS, closing at $102.94 per ADS on January 28th, on unusually high volume of approximately 42 million shares trading.

7.      Then, on January 29, 2015, before the market opened, Alibaba issued a press release announcing its financial results for the fourth quarter 2014 ("4Q 2014") ended December 31, 2014. The Company reported revenues of just $4.22 billion for the 4Q 2014, significantly under-achieving the $4.45 billion target defendants had led the investment community to expect based on Alibaba's bullish statements throughout the Class Period concerning its ongoing purported strong revenue growth. The Company also disclosed that its profits had fallen to $964 million, or

3

37 cents per share, a 28% decline from the financial results for the fourth quarter 2013 ("4Q 2013"), a decline Alibaba largely attributed to expenses from giving shares to employees. The Company also attributed challenges generating revenues from transactions on its mobile platforms, where advertising is less profitable than on personal computers, and which comprised a larger percentage of sales in the quarter than in the previous quarter.

8.       As a result of these disclosures, the price of Alibaba ADSs plummeted another $8.64 per ADS to close at $89.81 per ADS on January 29, 2015, a one-day decline of approximately 9%, again on extremely unusually high volume of more than 76.3 million shares trading. The two declines collectively reduced the price of Alibaba ADSs more than 25% from its Class Period high, erasing more than $11 billion in market capitalization.

## JURISDICTION AND VENUE

9.       The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the 1934 Act [15 U.S.C. §§78j(b) and 78t(a)] and Rule 10b-5 promulgated thereunder by the SEC [17 C.F.R. §240.10b-5].

10.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and §27 of the 1934 Act.

11.      Venue is proper in this District pursuant to §27 of the 1934 Act and 28 U.S.C. §1391(b). According to the IPO Prospectus, Alibaba "appointed Corporation Service Company, located at 1180 Avenue of the Americas, Suite 210, New York, New York 10036 as [its] agent to receive service of process with respect to any action brought against us in the United States District Court for the Southern District of New York under the federal securities laws of the United States." The ADSs IPO'd and trade on the New York Stock Exchange ("NYSE") located in this District. The roadshow used to sell the IPO took place, in large part, in the borough of Manhattan. The

Company's U.S. legal counsel, the underwriters who conducted the IPO and the underwriters' counsel are all largely located in this District and carried out the IPO in this District. Many of the acts charged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this District.

12.     In connection with the acts alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the NYSE stock market.

## PARTIES

13.     Plaintiff acquired Alibaba securities as set forth in the attached certification and has been damaged thereby.

14.     Defendant Alibaba is a China-based online and mobile commerce company in retail and wholesale trade, as well as cloud computing and other services. Alibaba ADSs trade in the United States on the NYSE, an efficient market, under the ticker symbol "BABA." The Company had more than 386 million ADSs issued and trading in the U.S. as of the date of its IPO.

15.     Defendant Ma, the lead founder of Alibaba is, and at all relevant time was, the Company's Executive Chairman of the Board.

16.     Defendant Tsai, co-founder of Alibaba, is, and at all relevant time was, Executive Vice Chairman of the Board of the Company.

17.     Defendant Jonathan Zhaoxi Lu ("Lu") is, and at all relevant times was, Chief Executive Officer ("CEO") and a director of the Company.

18.     Defendant Maggie Wei Wu ("Wu") was, at all relevant times, Chief Financial Officer ("CFO") of the Company.

19.     The defendants referenced above in ¶¶15-18 are referred to herein as the "Individual Defendants." The Individual Defendants made, or caused to be made, false statements which caused the prices of Alibaba's ADSs to be artificially inflated during the Class Period.

20.     The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Alibaba's quarterly reports, shareholder letters, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market. They were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions with the Company, and their access to material non-public information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading. The Individual Defendants are liable for the false and misleading statements pleaded herein.

21.     Defendants are liable for: (i) making false statements; or (ii) failing to disclose adverse facts known to them about Alibaba. Defendants' fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of Alibaba ADSs was a success, as it: (i) deceived the investing public regarding Alibaba's prospects and business; (ii) artificially inflated the prices of Alibaba ADSs; (iii) permitted Alibaba and the selling shareholders to raise more than $25 billion in the IPO and Alibaba to raise more than $8 billion in its Class Period private debt placement; and (iv) caused plaintiff and other members of the Class to purchase Alibaba ADSs at inflated prices.

6

## BACKGROUND

22.     Alibaba, founded in 1999, is a China-based online and mobile commerce company in retail and wholesale trade, as well as cloud computing and other services. The Company provides technology and services to enable consumers, merchants, and other participants to conduct commerce in what it calls its "ecosystem." The Company operates Taobao Marketplace, an online shopping destination, Tmall, a third-party platform for brands and retailers and Juhuasuan. The Company represents that it provides the fundamental technology infrastructure and marketing reach to help businesses leverage the power of the Internet to establish an online presence and conduct commerce with consumers and businesses.

23.     In July 2014, two months before its IPO, Alibaba executives met with China's SAIC during which meeting the regulators brought to Alibaba's attention a variety of highly dubious – even illegal – business practices that the SAIC advised Alibaba it was then actively clamping down on and which threatened the core of Alibaba's business, including:

- The rampant sale of counterfeit goods, including fake cigarettes, alcohol and branded handbags, by vendors on Alibaba's third-party marketplace platform;

- The sale of restricted weapons and other forbidden items on Alibaba's third-party marketplace platform;

- That Alibaba staffers had taken bribes from merchants and others seeking help to boost their search rankings and to get advertising space;

- That Alibaba ignored the practice by some vendors of faking transactions to make their sales volumes appear higher;
- That Company officials did nothing to stop merchants from using tactics such as false and misleading advertising; and

- Accused Alibaba of alleged anticompetitive behavior such as forbidding merchants to participate in rival sites' promotions.

**DEFENDANTS' MATERIALLY FALSE AND MISLEADING PRE-CLASS PERIOD STATEMENTS THAT REMAINED LIVE AND UNCORRECTED IN THE MARKET THROUGHOUT THE CLASS PERIOD AND CLASS PERIOD MISSTATEMENTS**

24.    On May 6, 2014, Alibaba filed with the SEC a Registration Statement on Form F-1, which would later be utilized for the IPO following several amendments in response to comments by the SEC. Each of the Individual Defendants signed the Registration Statement. On September 18, 2014, the SEC declared the Registration Statement effective. On or about September 19, 2014, Alibaba priced the IPO at $68 per ADS and filed the final Prospectus for the IPO on September 22, 2014, which forms part of the Registration Statement (collectively, the "Registration Statement").

25.    Concerning the purported integrity of Alibaba's third-party marketplace portal – or its "growing ecosystem" – and the legitimacy of the products being sold there, the Registration Statement stated in pertinent part as follows:

> *We have been a leader in developing online marketplace standards in China.* Given the scale we have been able to achieve, an ecosystem has developed around our platform that consists of buyers, sellers, third-party service providers, strategic alliance partners, and investee companies. Our platform and the role we play in connecting buyers and sellers and making it possible for them to do business anytime and anywhere is at the nexus of this ecosystem. *Much of our effort, our time and our energy is spent on initiatives that are for the greater good of the ecosystem and the various participants in it.* We feel a strong responsibility for the continued development of the ecosystem and we take ownership for this development. Accordingly, we refer to this as "our ecosystem."
>
> *Our ecosystem has strong self-reinforcing network effects that benefit our marketplace participants, who are invested in our ecosystem's growth and success. Through this ecosystem, we have transformed how commerce is conducted in China and built a reputation as a trusted partner for the participants in our ecosystem.*[1]

---

[1] Emphasis added unless otherwise noted.

26.     Emphasizing the Company's purportedly *"Trusted Brands,"* the Registration Statement highlighted as a "Competitive Strength" that "Alibaba, Taobao, Tmall [were] well recognized and trusted brands in China," that "[d]ue to the strength of these brands, a majority of [its] customers navigate[d] directly to [its] China retail marketplaces to find the products and services they [were] seeking instead of via third-party search engines."

27.     The Registration Statement also emphasized the Company's *"Thriving Ecosystem with Powerful Network Effects,"* stating that it was "the steward of a thriving ecosystem, which provide[d] [it] with [certain] key advantages," including that *"interactions among participants create[d] value for one another as [its] ecosystem expand[ed] and generate[d] strong network effects."*

28.     The Registration Statement further emphasized the Company's "Data Insights" and "Third-party Platform Business Model" as competitive strengths, stating in pertinent part as follows:

- *Data Insights.* Data from consumer behavior and transactions completed on our marketplaces and interactions among participants in our ecosystem *provide us with valuable insights to help us and our sellers improve the buyer experience*, operate more efficiently and create innovative products and services.

- *Third-party Platform Business Model.* Our exclusively third-party platform business model allows us to scale rapidly *without the risks and capital requirements of sourcing, merchandising and holding inventory borne by direct sales companies*. This business model *drives our profitability and strong cash flow*, which give us the flexibility to further invest in and improve our platform, expand our ecosystem and aggressively invest in people, technology, innovative products and strategically important assets.

29.     Concerning ongoing revenue growth purportedly then being experienced, and importantly that which could be expected in the Company's 4Q 2014, the Registration Statement stated, in pertinent part, as follows:

Due to promotional events and higher consumer spending in the quarters ended June 30 and December 31, merchants are inclined to allocate more of their marketing spending during these periods to compete for and attract this consumer spending, *which therefore drives revenue growth during those periods* disproportionately to GMV growth and because *increased demand for such services also increases pricing*.

30. Pursuant to Item 303 of Regulation S-K [17 C.F.R. §229.303], and the SEC's related interpretive releases thereto, including any known trends, issuers are required to disclose events or uncertainties that have had or are reasonably likely to cause the registrant's financial information not to be indicative of future operating results. Prior to the IPO, Alibaba and SAIC had met and the Company was advised that Alibaba was engaging in a proliferation of unscrupulous-if not illegal business practices. The adverse events and uncertainties associated with this meeting and the practices discussed at the meeting were reasonably likely to have a material impact on Alibaba's continuing operations and, therefore, were required to be disclosed in the Registration Statement but were not.

31. Defendant Ma emphatically denied at the time of the IPO that Alibaba would undertake any untoward business practices to increase sales to the detriment of reputation, telling CNBC on September 19, 2014 that he had "always believe[d] that customer is number one, employee number two and shareholders are number three." Refuting that he would ever take action to drive up stock prices to the detriment of customers, he told *The Independent* on September 22, 2014 that "[f]or me, the price, up and down, my people worry about that. I want to make the customer happy." On September 17th he told *Charlie Rose:* "I have said on numerous occasions that we will put 'customers first, employees second and shareholders third.' I can see that investors who hear this for the first time may find it a bit hard to understand. Let me be clear: as fiduciaries of the company, we believe that the only way for Alibaba to create long-term value for shareholders is to create sustainable value for customers. So customers must come first." On 60

10

Minutes in late September 2014, Ma proclaimed: "If you want to invest in us, we believe customer No. 1, employee No. 2, shareholder No. 3. If they don't want to buy that, that's fine. If they regret, they can sell us."

32.     On November 4, 2014, before the market opened, Alibaba issued a press release announcing its financial results for the 3Q 2014 ended September 30, 2014. The Company reported net income of $494 million, or 20 cents per share, on revenues of $2.7 billion. Concerning the strength of the Company's ongoing business, the press release stated, in pertinent part, as follows:

> "We delivered a strong quarter with significant growth across our key operating metrics," said Jonathan Lu, chief executive officer of Alibaba Group. "*Our business continues to perform well, and our results reflect both the strength of our ecosystem and the strong foundation we have for sustainable growth*. On our China retail marketplaces, gross merchandise volume for the quarter increased 49% and annual active buyers increased 52% year on year. We extended our unrivaled leadership in mobile with 217 million monthly active users on our mobile commerce apps in September and US$95 billion in mobile GMV for the twelve months ended September 2014. *We are also encouraged by continued improvement of mobile monetization which demonstrates the strong commercial intent of our users*."

> "Our financial performance this quarter was robust, with revenue growing 54% year on year," said Maggie Wei Wu, chief financial officer of Alibaba Group. "*We continue to execute our focused growth strategy, and the fundamental strength of our business gives us the confidence to invest in new initiatives to add new users, improving engagement and customer experience, expand our products and services and drive long-term shareholder value*."

33.     Later that day, Defendants Tsai, Lu and Wu conducted a call with investors to discuss the quarterly financial results, making additional positive statements about the strength of the Company's ongoing business metrics and financial prospects.

34.     On November 11, 2014, the Company issued a press release entitled "Alibaba Group Generated US$2 Billion in GMV in First Hour of 11.11 Shopping Festival," highlighting that the sales had greatly exceeded expectations in the annual event.

35.     On November 11, 2014, Defendant Ma was also interviewed by CNBC's David Faber on "Squawk on the Street." Concerning the importance of the Company's good reputation and not chasing sales to increase the stock price at the cost of damaging reputation, Defendant Ma emphasized that Alibaba always put its customers' best interests before the stock market's perception of Alibaba's profitability and worth, stating in pertinent part as follows:

> JACK MA: --YOU KEEP-- YOU TRY TO KEEP THE PEOPLE YOU TRUST, AND THEY TRUST IN YOU, HAPPY. 'CAUSE I CANNOT MAKE EVERY SHAREHOLDER HAPPY. *THE SHAREHOLDER HAS TO UNDERSTAND THIS COMPANY HAVE A STRANGE UNIQUE PHILOSOPHY. WE ARE BUILDING ON A BUSINESS MODEL THAT'S A ECOSYSTEM.* NOBODY EVER HEARD OF THAT. *WE'RE FOCUSING ON HELPING CUSTOMERS, SMALL BUSINESS.* WE'RE FOCUSING ON MAKING SURE THAT EMPLOYEE HAPPIES AND THEN THE SHAREHOLDER.

> DAVID FABER: AND SO--IF I HAVE TO ASK YOU TO DESCRIBE THE CULTURE OF ALIBABA, WHAT IS IT? IS IT THAT?

> JACK MA: *TRUST AND TRANSPARENT.* 'CAUSE WE ARE WORKING WITH-- MY COMPANY AND THE TEAM HAVE-- WE HAVE 30 THOUSAND SMART PEOPLE. *IF YOU WORK WITH THE SMART PEOPLE, YOU GOTTA BE TRANSPARENT. YOU GOTTA MAKING SURE THEY TRUST YOU AND YOU TRUST THEM AND MAKING SURE THAT EVERYBODY HAVE THE SAME VISION-- AND VISION AND VALUE. AND THESE ARE THE CORE.* 'CAUSE THEY'RE SO SMART. IT SI SOMETIMES GREAT TO WORK WITH THE STUPID GUYS, WHATEVER YOU SAY, THEY'LL FOLLOW IT. BUT IT'S A GOOD PAIN IF THEY-- IF YOU ARE SMART THAN THEM—IT IS A DISASTER

36.     Then on November 12, 2014, the Company issued a release entitled "Alibaba Group Generated US$9.3 Billion in GMV on 11.11 Shopping Festival - Mobile GMV Accounted for 42.6%." This release further emphasized the purportedly strong quarter the Company was then having, stating, in pertinent part, as follows:

> "On behalf of our entire ecosystem — from millions of buyers and merchants both here and abroad — we are very happy with the results of this year's 11.11 shopping festival," said Jonathan Lu, CEO of Alibaba Group. *"We are particularly encouraged by the growing trend of*

*consumers embracing mobile shopping on a global stage.* Alibaba is humbled to play a role in making it easy for people to do business anywhere."

The 11.11 Shopping Festival ("11.11") began in 2009 with 27 merchant participants as an event for Tmall.com merchants and consumers to raise awareness of the value in online shopping. *This year, more than 27,000 brands and merchants participated in the event, including Costco, Muji, Desigual, ASOS, and The North Face. By expanding globally with the participation of AliExpress and Tmall Global, consumers from over 217 countries and regions were able to select from more than one million products through online storefronts and e-commerce websites.*

37.    On November 13, 2014, the Company issued a press release stating that it was going to offer Senior Unsecured Notes (the "Notes"). On November 21, 2014, the Company announced the following pricing of the Notes which would be sold to the U.S. investing public in an offering exempt from registration under the federal securities laws for a total of $8 billion:

US$300 million floating rate notes due 2017 at an issue price per note of 100.000%;

US$1,000 million 1.625% notes due 2017, at an issue price per note of 99.889%;

US$2,250 million 2.500% notes due 2019 at an issue price per note of 99.618%;

US$1,500 million 3.125% notes due 2021 at an issue price per note of 99.558%;

US$2,250 million 3.600% notes due 2024 at an issue price per note of 99.817%; and

US$700 million 4.500% notes due 2034 at an issue price per note of 99.439%.

38.    The Notes were priced favorably to Alibaba based on its then present strong corporate debt ratings.

39.    On December 8, 2014, the Company issued a press release entitled "Alipay 2014 Spending Report Sheds Light on Chinese Online Spending Behavior." Alipay was launched in

2004 as part of the Alibaba Group's "ecosystem" and provides the Company's online payment services. The release stated, in pertinent part, as follows:

> Alipay, China's largest online payment service provider, marks its 10-year anniversary today with the release of its Annual Spending Report, highlighting the development of online economic activity and consumer behavior of Chinese Internet users over the past decade (2004 through October 31, 2014). *According to the report, the availability of online-payment services has played a major role in making goods and services widely accessible throughout Chinese society, especially in less-developed interior provinces and counties where people now enjoy equal access to branded products at the same prices as those living in first- and secondtier cities.*
>
> * * *
>
> Meanwhile, with ongoing advances in mobile Internet technology, e-commerce in China continues to shift from desktop PCs to smartphones and other mobile devices. From 2012 to 2014, the proportion of mobile payments to total payments in some of the country's less-developed regions more than doubled, *indicating consumers in rural areas and smaller cities are quickly adopting mobile devices as their primary tool for online shopping as more people in China have access to mobile devices and smartphones*.

40.     On December 23, 2014, the Company issued a press release entitled "2014 Counterfeit Report Press Conference - Speech By Jonathan Lu, CEO of Alibaba Group - Hangzhou, China, December 23, 2014." The release claimed Alibaba was actively monitoring and deterring counterfeit sales on its platform and other fraudulent activity, stating, in pertinent part, as follows:

> Ever since the founding of Alibaba Group in 1999, it has been our mission to make it easy to do business anywhere. *This ease of doing business must be facilitated by trust. We believe that trust is the basis for wealth and that trust is an important currency that makes our e-commerce platforms tick . All the work that we have done over the past 15 years underscores this belief.*
>
> *Since the establishment of Taobao in 2003, Alibaba Group has constantly fought to protect the interests of consumers in the Internet space and*

14

*together with our valued government partners, we have made great strides in addressing this issue.*

However counterfeiting is a global problem and one that we need to face together as a society. From Alibaba Group's perspective, we bear a serious responsibility in this fight against counterfeits. Jack Ma said yesterday – if e-commerce does well in China, that may have little to do with Alibaba Group, but if counterfeits in society are not tackled effectively, it has a lot to do with Alibaba Group.

*In our years of combating this problem, we have built cooperative relationships with various government bodies to combat counterfeiting at its source in order to safeguard the interests of consumers. We have built systems and services like Alipay that are based on trust and are there to protect the consumer because in the end, counterfeiting hurts Alibaba Group as consumers who receive fake goods may no longer want to shop on our platforms.*

*Thankfully, Internet technology has made it easier for transactions to be traced. This means that by analyzing transaction data we can trace counterfeiters who sell online. Through the analysis of big data, online sources of counterfeit products can be tracked offline, making it easier to enforcement authorities to do their work.*

Secondly, we believe that protecting customer rights and combating counterfeits should be a long-term and persistent goal. To achieve that, support needs to come from all levels of society. *Through the years, Alibaba Group has become more effective at protecting consumer rights and combating counterfeits. According to the latest data available, only 3.5 transactions in every 10,000 transactions received customer complaints, 22% decline from last year.*

Effectively combating the counterfeiting issue requires the active involvement from different government agencies and authorities, as the root of the counterfeit problem is offline. *By collaborating with China's Public Security Bureau, the General Administration of Quality Supervision, China's State Intellectual Property Office and State Administration of Press, Publication, Radio, Film and Television and leveraging new tools such as the Internet and big data, Alibaba hopes that these measures will be impactful in combating fakes in the real world. We hope that by exposing counterfeiters and supporting the fight in a long-term fashion, fakes can be eliminated one day.*

41.     On January 8, 2015, the Company issued a press release entitled "Alibaba and Microsoft Collaborate To Improve Online Customer Experience, Creating a Safer Internet." The

release again claimed Alibaba was actively monitoring and deterring counterfeit sales on its
platform and other fraudulent activity, stating in pertinent part as follows:

> *"Alibaba Group takes the issue of IPR infringement very seriously and we*
> *are constantly working with partners and stakeholders to enhance IPR*
> *protection on our platforms in order to tackle the problem of*
> *counterfeiting effectively," said Ni Liang, Alibaba Group's Senior*
> *Director of Security Operations.*

42.     The true facts, which were known by the defendants throughout the Class Period,
but were not disclosed to the investing public were as follows:

a)      the Company was engaged in a proliferation of unscrupulous – if not illegal
– business practices;

b)      Chinese regulators had brought the Company's unscrupulous business
practices to its attention in July 2014 as part of their efforts to increase enforcement of consumer
protection laws in China, exposing the Company fines, penalties and damage to reputation; and

c)      Alibaba's 4Q 2014 sales growth was declining as a result of its
unscrupulous business practices.

43.     On January 28, 2015, before the opening of trading, various members of the
financial media reported that SAIC, China's main corporate regulator, had released a white paper
accusing Alibaba of engaging in the illegal conduct disclosed to Alibaba executives in July 2014.
Specifically, it was disclosed that in July 2014, two months prior to the IPO, regulators had brought
to Alibaba's attention a variety of highly dubious – even illegal – business practices that the SAIC
advised Alibaba it was then actively clamping down on and which threatened the core of Alibaba's
business, including:

- The rampant sale of counterfeit goods, including fake cigarettes, alcohol and
  branded handbags, by vendors on Alibaba's third-party marketplace platform;

16

- The sale of restricted weapons and other forbidden items on Alibaba's third-party marketplace platform;

- That Alibaba staffers had taken bribes from merchants and others seeking help to boost their search rankings and to get advertising space;

- That Alibaba ignored the practice by some vendors of faking transactions to make their sales volumes appear higher;

- That Company officials did nothing to stop merchants from using tactics such as false and misleading advertising; and

- Accused Alibaba of alleged anticompetitive behavior such as forbidding merchants to participate in rival sites' promotions.

44.     As reported by the *Wall Street Journal* on January 28th, whose reporters had reviewed the SAIC whitepaper before it was removed from SAIC's website:

> The Chinese government accused e-commerce giant Alibaba of failing to crack down on the sale of fake goods, bribery and other illegal activity on its sites in a rare public dispute with one of the country's most prominent companies.
>
> * * *
>
> Alibaba has long grappled with allegations that Taobao, its biggest e-commerce platform, is rife with counterfeit goods. *The accusations from the Chinese government could lend further force to those complaints and damage Alibaba's reputation among investors and brands overseas, while the highly public spat could hurt the company's relationship with the government, experts warn.*
>
> The government's accusations are in a white paper made public on Wednesday by China's State Administration for Industry and Commerce, *but based on conversations between the agency and Alibaba officials in July.* That was two months before Alibaba's U.S. IPO, which valued the Chinese company at more than $230 billion. *In the paper, the agency said it held off on disclosing details of the talk so as not to affect the IPO.*
>
> * * *
>
> *The report said the problems had grown to become Alibaba's "greatest credibility crisis" since the company was established. Citing a Chinese phrase that refers to letting a small problem fester, the paper said, "for a long time, [Alibaba] didn't pay sufficient attention to the issue and didn't*

*adopt effective measures, causing a neglected carbuncle to become the
bane of its life."*

45.     On this news, the price of Alibaba ADSs dropped 4%, or $4.49 per ADS, closing

at $102.94 on January 28th, on unusually high volume of approximately 42 million shares trading.

46.     Then, on January 29, 2015, before the market opened, Alibaba issued a press release

announcing its financial results for the fourth quarter 2014 ended December 31, 2014. The

Company reported revenues of just $4.22 billion for the 4Q 2014, significantly under-achieving

the $4.45 billion target defendants had led the investment community to expect based on Alibaba's

bullish statements throughout the Class Period concerning its ongoing strong revenue growth. The

Company also disclosed that its profits had fallen to $964 million, or 37 cents per share, a 28%

decline from the 4Q 2013, a decline Alibaba largely attributed to expenses from giving shares to

employees. The Company also attributed challenges generating revenues from transactions on its

mobile platforms, where advertising is less profitable than on personal computers, and which

comprised a larger percentage of sales in the quarter than in the previous quarter.

47.     As a result of these disclosures, the price of Alibaba ADSs plummeted another

$8.64 per ADS to close at $89.81 per ADS on January 29, 2015, a one-day decline of

approximately 9%, again on unusually high volume of more than 76.3 million shares trading. The

two declines collectively reduced the price of Alibaba's ADSs more than 25% from its Class

Period high, erasing more than $11 billion in market capitalization.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

48.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil

Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise

acquired Alibaba securities during the Class Period (the "Class"); and were damaged upon the

revelation of the alleged corrective disclosures. Excluded from the Class are defendants herein,

the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

49.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Alibaba ADSs were actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Alibaba or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

50.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

51.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.  Plaintiff has no interests antagonistic to or in conflict with those of the Class.

52.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by defendants' acts as alleged herein;

- whether statements made by defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Alibaba;

- whether the Individual Defendants caused Alibaba to issue false and misleading financial statements during the Class Period;

- whether defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of Alibaba securities during the Class Period were artificially inflated because of the defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

53.   A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

54.   Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- Alibaba securities are traded in an efficient market;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NYSE and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiff and members of the Class purchased, acquired and/or sold Alibaba securities between the time the defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

20

55.    Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

56.    Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT I

### (Against All Defendants For Violations of
### Section 10(b) And Rule 10b-5 Promulgated Thereunder)

57.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

58.    This Count is asserted against defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

59.    During the Class Period, defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities.  Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Alibaba securities; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire Alibaba

21

securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

60.     Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Alibaba securities. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Alibaba's finances and business prospects.

61.     By virtue of their positions at Alibaba, defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to defendants. Said acts and omissions of defendants were committed willfully or with reckless disregard for the truth. In addition, each defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

62.     Defendants were personally motivated to make false statements and omit material information necessary to make the statements not misleading in order to personally benefit from the sale of Alibaba securities from their personal portfolios.

63.     Information showing that defendants acted knowingly or with reckless disregard for the truth is peculiarly within defendants' knowledge and control. As the senior managers

22

and/or directors of Alibaba, the Individual Defendants had knowledge of the details of Alibaba's internal affairs.

64.    The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein.  Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of Alibaba.  As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Alibaba's businesses, operations, future financial condition and future prospects.  As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Alibaba securities was artificially inflated throughout the Class Period.  In ignorance of the adverse facts concerning Alibaba's business and financial condition which were concealed by defendants, Plaintiff and the other members of the Class purchased or otherwise acquired Alibaba securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by defendants, and were damaged thereby.

65.    During the Class Period, Alibaba securities were traded on an active and efficient market.  Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Alibaba securities at prices artificially inflated by defendants' wrongful conduct.  Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid.  At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true

value of Alibaba securities was substantially lower than the prices paid by Plaintiff and the other members of the Class.  The market price of Alibaba securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

66.     By reason of the conduct alleged herein, defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

67.     As a direct and proximate result of defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

### (Violations of Section 20(a) of the Exchange Act Against The Individual Defendants)

68.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

69.     During the Class Period, the Individual Defendants participated in the operation and management of Alibaba, and conducted and participated, directly and indirectly, in the conduct of Alibaba's business affairs.  Because of their senior positions, they knew the adverse non-public information about Alibaba's misstatement of income and expenses and false financial statements.

70.     As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Alibaba's financial condition and results of operations, and to correct promptly any public statements issued by Alibaba which had become materially false or misleading.

71.     Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Alibaba disseminated in the marketplace during the Class Period concerning Alibaba's results of operations.  Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Alibaba to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of Alibaba within the meaning of Section 20(a) of the Exchange Act.  In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Alibaba securities.

72.     Each of the Individual Defendants, therefore, acted as a controlling person of Alibaba.  By reason of their senior management positions and/or being directors of Alibaba, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Alibaba to engage in the unlawful acts and conduct complained of herein.  Each of the Individual Defendants exercised control over the general operations of Alibaba and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

73.     By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Alibaba.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment against defendants as follows:

A.     Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.     Requiring defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.    Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.    Awarding such other and further relief as this Court may deem just and proper.

**JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury.

Dated:   February 3, 2015

POMERANTZ LLP

Jeremy A. Lieberman
Francis P. McConville
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone:  (212) 661-1100
Facsimile:  (212) 661-8665

**POMERANTZ LLP**
Patrick V. Dahlstrom
10 South La Salle Street, Suite 3505
Chicago, Illinois 60603
Telephone:  (312) 377-1181
Facsimile:  (312) 377-1184

*Attorneys for Plaintiff*

## CERTIFICATION PURSUANT
## TO FEDERAL SECURITIES LAWS

1.    I, _____Deborah    Klein_____, make this declaration pursuant to Section 27(a)(2) of the Securities Act of 1933 ("Securities Act") and/or Section 21D(a)(2) of the Securities Exchange Act of 1934 ("Exchange Act") as amended by the Private Securities Litigation Reform Act of 1995.

2.    I have reviewed a Complaint against Alibaba Group Holding Limited ("Alibaba" or the "Company"), and authorize the filing of a comparable complaint on my behalf.

3.    I did not purchase or acquire Alibaba securities at the direction of plaintiffs counsel or in order to participate in any private action arising under the Securities Act or Exchange Act.

4.    I am willing to serve as a representative party on behalf of a Class of investors who purchased or acquired Alibaba securities during the class period, including providing testimony at deposition and trial, if necessary. I understand that the Court has the authority to select the most adequate lead plaintiff in this action.

5.    To the best of my current knowledge, the attached sheet lists all of my transactions in Alibaba securities during the Class Period as specified in the Complaint.

6.    During the three-year period preceding the date on which this Certification is signed, I have not sought to serve as a representative party on behalf of a class under the federal securities laws.

7.    I agree not to accept any payment for serving as a representative party on behalf of the class as set forth in the Complaint, beyond my pro rata share of any recovery, except such reasonable costs and expenses directly relating to the representation of the class as ordered or approved by the Court.

8.   I declare under penalty of perjury that the foregoing is true and correct.


Executed    1/30/15
                 **(Date)**


                                                    _____
                                                    **(Signature)**

                                                    ___Devorah   Klein_____
                                                    **(Type or Print Name)**

## SUMMARY OF PURCHASES AND SALES

| DATE | PURCHASE OR SALE | NUMBER OF SHARES | PRICE PER SHARE |
|---|---|---|---|
| 11/4/14 | Purchase | 200 | 104.95 |
| 12/9/14 | Purchase | 100 | 105.70 |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |