UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

_____X

MANISHKUMAR KHUNT, Individually and on
Behalf of All Others Similarly Situated,

       Plaintiff,

    -against-

ALIBABA GROUP HOLDING LIMITED,
JACK YUN MA, JOSEPH C. TSAI, JONATHAN
ZHAOXI LU and MAGGIE WEI WU,

       Defendants.

_____X

DEVORAH KLEIN, Individually and on
Behalf of All Others Similarly Situated,

       Plaintiff,

    -against-

ALIBABA GROUP HOLDING LIMITED,
JACK YUN MA, JOSEPH C. TSAI, JONATHAN
ZHAOXI LU and MAGGIE WEI WU,

       Defendants.

_____X

CLAIRE RAND, Individually and on
Behalf of All Others Similarly Situated,

       Plaintiff,

    -against-

ALIBABA GROUP HOLDING LIMITED,
JACK YUN MA, JOSEPH C. TSAI, JONATHAN
ZHAOXI LU and MAGGIE WEI WU,

       Defendants.

_____X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:  5/1/15

No. 15 Civ. 00759 (CM)

No. 15 Civ. 00811 (CM)

No. 15 Civ. 00991 (CM)

(Caption continued on following page)

1

_____x

JAMES AND CHRISTINE ZIOLKOWSKI,
Individually and on Behalf of All Others Similarly
Situated,

   Plaintiffs,

  -against-         No. 15 Civ. 01405 (CM)

ALIBABA GROUP HOLDING LIMITED,
JACK YUN MA, JOSEPH C. TSAI, JONATHAN
ZHAOXI LU and MAGGIE WEI WU,

   Defendants.
_____x

## MEMORANDUM DECISION AND ORDER CONSOLIDATING CASES, APPOINTING LEAD PLAINTIFF, AND APPOINTING LEAD COUNSEL

McMahon, J.:

In autumn 2014, Defendant Alibaba Group Holding Limited ("Alibaba" or the "Company"), a China-based giant of online commerce, together with certain "selling shareholders," raised more than $25 billion through an Initial Public Offering ("IPO"). In the early hours of January 28, 2015, various media reported that China's main corporate regulator had released a white paper publicly accusing Alibaba of complicity in various anticompetitive, fraudulent, and otherwise illegal business practices. By the close of business on January 29, 2015, Alibaba American Depository Shares ("ADSs") had lost 25% of their value as compared with a November 13, 2014 high of $120 per ADS in intraday trading, erasing more than $11 billion in market capitalization.

In the weeks following the Chinese regulators' public accusations, investors filed seven putative security class actions against Alibaba and four of its officers (the "Individual Defendants"). The complaints are substantially identical; they seek to certify classes of purchasers of Alibaba ADSs between October 21, 2014 and January 28, 2015 (the "Class Period"), and pursue

2

remedies under the Securities Exchange Act of 1934 (the "Exchange Act").  Four of the actions were filed in this Court, two were filed in the Central District of California, and one was filed in the Northern District of California.

A motion to transfer all seven cases to this Court is currently pending before the Judicial Panel on Multidistrict Litigation.

Now before this Court are seven competing motions for the appointment of a lead plaintiff and lead counsel, as well as unopposed motions to consolidate the four cases that are pending before me.

For the reasons that follow, the motions to consolidate are GRANTED as to the four cases before me.  In these consolidated cases, William Tai and Christine Asia Co., Ltd. are appointed as co-lead plaintiffs.  The Rosen law firm is appointed as lead counsel.

## BACKGROUND

Alibaba is a China-based online and mobile commerce company that engages in retail and wholesale trade, as well as cloud computing and other services.  The Company hosts an online sales platform for third parties and does not engage in any direct sales, compete with merchants or hold inventory.

The Company's stock is listed and trades on the New York Stock Exchange under the ticker BABA.  The complaints allege that the defendants issued materially false and misleading statements regarding the soundness of the Company's business operations and the strength of its financial prospects, and concealed substantial ongoing regulatory scrutiny during the Class Period.  Specifically, Alibaba failed to disclose that Company executives had met with China's State Administration of Industry and Commerce ("SAIC") in July 2014, two months before Alibaba's

3

$25 billion IPO. At that meeting, the complaints allege regulators informed Alibaba that they were actively trying to discourage business practices that Alibaba allegedly enabled or engaged in directly, including:

- The sale of counterfeit goods such as fake cigarettes, alcohol and branded handbags, by vendors on Alibaba's third-party marketplace platform;

- The sale of restricted weapons and other forbidden items on Alibaba's third-party marketplace platform;

- Alibaba staffers' alleged acceptance of bribes from merchants and others seeking to raise their search rankings and to get advertising space;

- Alibaba's alleged willful ignorance of the practice by some vendors of faking transactions to artificially inflate their sales volumes;

- Company officials' alleged failure to take actions to prevent merchants from using false and misleading advertising; and

- Alleged anticompetitive behavior, such as forbidding merchants to participate in rival sites' promotions.

Before the disclosure of those alleged facts, and from approximately October 2014 through January 27, 2015, Alibaba and certain "selling shareholders" sold more than 368 million ADSs in Alibaba's United States IPO, raising more than $25 billion. Through the Class Period, Alibaba's ADSs continued trading at ever-increasing, allegedly artificially inflated prices, reaching a Class Period high of $120 per ADS in intraday trading on November 13, 2014.

Before the market opened on January 28, 2015, media reported that SAIC had publicly accused Alibaba of the illegal practices discussed at the July meeting. On this news, the price of Alibaba ADSs declined by $4.49 per ADS on a volume of approximately 42 million shares trading.

The next day, January 29, 2015, before the market opened, Alibaba issued a press release announcing revenues of just over $4 billion for the fourth quarter of 2014 (ending on December 31, 2014). This missed the $4.45 billion target defendants led the investment community to expect

4

through "bullish" statements throughout the Class Period concerning Alibaba's ongoing and purportedly strong revenue growth. The Company also disclosed that its profits had fallen to $964 million, a 28% decline from the fourth quarter of 2013. Alibaba attributed the decline to expenses from giving shares to employees, and to challenges with its mobile platforms, where advertising is less profitable than on personal computers, and which comprised a larger percentage of sales in the fourth quarter of 2014 than in the previous quarter.

Allegedly as a result of both of these disclosures, the price of Alibaba ADSs dropped another $8.64 per ADS on January 29, 2015, a one-day decline of approximately 9%, on a trading volume of more than 76.3 million shares trading. The two declines collectively reduced the price of Alibaba ADSs more than 25% from its Class Period high, eliminating more than $11 billion in market capitalization.

## PROCEDURAL HISTORY

Seven substantially identical putative securities class actions have been filed against Alibaba and the Individual Defendants in connection with the facts described above. Four are pending in this Court, two were filed in the Central District of California, and one is before the Northern District of California. The Judicial Panel on Mutidistrict Litigation is now considering a motion to transfer all pending matters to this Court. Defendants, together with three of four lead plaintiff movants, take the position that the three California actions against Alibaba and the Individual Defendants should be transferred here. The remaining lead plaintiff movant, the BABA group (described in greater detail below), has asked that all actions be transferred to the Northern District of California.

Beginning on March 31, 2015, aggrieved investors filed seven competing motions to be appointed Lead Plaintiff, with corresponding requests for the appointment of various lead counsel. All asked that the four actions before this Court be consolidated.

The original movants were: (1) Mr. Richard Houlihan (Docket ## 11-13[1]); (2) Christine Asia Co., Ltd. ("CAC") (Docket ## 14-15); (3) Mr. "Tai William," also known as Mr. William Tai (hereinafter "Tai") (Docket ## 16-18); (4) the brothers Yangmin and Yiwei Zhang (Docket ## 19, 22, 24); (5) Mr. Gang Liu (Docket ## 20-21, 23); (6) husband and wife William Yun Cheong Wong and Elke Lai-Hing Lee ("Wong and Lee") (Docket ## 25-27); and (7) a group of six individual purported class members – Mr. Robert Kegley, Mr. John Sorensen, Mr. Marc Phillips, Mr. Thomas Wood, Mr. Daniel Hurt, and Mr. Richard Adray – calling themselves the "BABA Investor Group" (Docket ## 28-30).

Several movants changed their positions after seeing competing movants' papers. Mr. Houlihan and Mr. Liu withdrew their motions, while "standing ready" to serve as lead plaintiff if a qualified lead plaintiff could not otherwise be located. Liu also proposed a sub-class of options purchasers.

It also became clear that movant Tai wholly owns movant CAC and is its sole director. Each had filed separate motions to become Lead Plaintiff, each swearing to the Court that it had – to its knowledge – the largest losses of any movant, and each proposing different class counsel. In a declaration, Tai swore that he had:

> authorized the filing of separate lead plaintiff motions to be filed on behalf of CAC and myself. On March 31, 2015, [The Rosen Law Firm, P.A.] filed a lead plaintiff motion on behalf of CAC and Glancy Binkow & Goldberg, LLP . . . filed a lead plaintiff motion on behalf of myself. I mistakenly believed filing two separate lead plaintiff motions would increase my chances of being a lead plaintiff in the case.

---

[1] Identical papers have been filed in all four actions.  For ease of reference, I use the docket numbering of the first-filed action, 15 Civ. 00759.

(Docket #35-1 at 2.) In his reply brief, Tai proposed that he and his company, CAC, act as co-lead plaintiffs, with the two firms acting as co-lead counsel. The two law firms were previously unaware of each other's contact with Tai.

On April 24, 2015, the Court held a conference to enlighten itself about the lead plaintiff movants. The defendants, the BABA group, the Zhangs, Wong and Lee, and Tai and CAC appeared. No other movant or plaintiff appeared.

All movants request consolidation of the four actions currently before the Court. Defendants do not oppose that request. It is, therefore, granted.

The following movants still ask to be appointed Lead Plaintiff: (1) Tai and CAC proceeding together, or, alternatively, CAC alone, or, alternatively, Tai alone; (2) the BABA group, or, in the alternative, its member who suffered the largest individual loss, Robert Kegley; (3) the Zhang brothers; and (4) Wong and Lee. Each candidate proposes that its retained counsel be appointed as class counsel, with Tai and CAC requesting the appointment of co-lead counsel.

Mr. Liu did not appear at the hearing to press his proposed subclass of options purchasers. The BABA group avers that it contains an individual investor, Marc Phillips, who was an options purchaser and who suffered a greater loss than Mr. Liu. However, at the hearing, the BABA group took the position that there is no present need for any subclass.

If either Tai or CAC were to be considered as Lead Plaintiff, the Zhangs and the BABA group request expedited discovery concerning the circumstances giving rise to Tai and CAC's initial, competing filings.

Defendants take no position on who should serve as Lead Plaintiff or lead counsel, but suggest that the Court stay its decision on those matters until after the JPML issues a decision

7

regarding transfer. Having familiarized myself with the facts of this case and the proposed lead plaintiffs, as well as voluminous briefing, I decline to do so.


## DISCUSSION

The Private Securities Litigation Reform Act ("PSLRA") requires that courts presiding over putative securities class actions resolve questions of consolidation before appointing a lead plaintiff. 15 U.S.C. § 78u-4(a)(3)(B)(ii). I thus turn to that question first.

### I.      The Above-Captioned Actions Will Be Consolidated.

"Consolidation of cases is appropriate" where "actions before the court involve a common question of law or fact." *Quan v. Advanced Battery Techs.*, 2011 U.S. Dist. LEXIS 102723, at *5 (S.D.N.Y. Sept. 9, 2011) (quoting Fed. R. Civ. P. 42(a)).

The four cases captioned above include substantially identical complaints. Each asserts claims under §10(b) and §20(a) of the Exchange Act, on behalf of purchasers of Alibaba ADSs, during the same Class Period, against the same defendants, and on virtually identical facts.

No one opposes consolidation.

The motions for consolidation are granted. Matters 15 Civ. 00759 (filed January 30, 2015), 15 Civ. 00811 (filed February 3, 2015), 15 Civ. 00991 (filed February 11, 2015); and 15 Civ. 1405 (filed February 25, 2015), are hereby consolidated for all purposes.

### II.     The Most Adequate Lead Plaintiff in the Consolidated Actions

"As soon as practicable" after consolidation, a court, "shall appoint the most adequate plaintiff as lead plaintiff for the consolidated actions." 15 U.S.C. § 78u-4(a)(3)(B)(ii). The "most adequate plaintiff" is "the member or members of the purported plaintiff class that the court

determines to be most capable of adequately representing the interests of class members." 15 U.S.C. § 78u-4(a)(3)(B)(i).

The statute creates a rebuttable presumption that the most adequate plaintiff is he who (1) either filed the complaint or moved to be appointed lead plaintiff; (2) has the largest financial interest in the relief sought by the class; and (3) otherwise satisfies the requirements of Federal Rule of Civil Procedure 23. 15 U.S.C. § 78u-4(a)(3)(B)(iii).

## A. Tai and CAC Together Have the Largest Financial Interest in the Relief Sought by the Class.

The PSLRA provides little guidance in how to assess a party's financial interest. However, "Courts in this District tend to rely on the *Lax/Olsten* factors, derived from *Lax v. First Merchant Acceptance Corp.,* 1997 U.S. Dist. LEXIS 11866, 1997 WL 461036 (N.D.Ill, August 11, 1997) and *In re Olsten Corp. Sec Litig.,* 3 F.Supp.2d 286, 295 (E.D.N.Y.1998)." *Beckman v. Ener1, Inc.,* No. 11 Civ. 5794, 2012 WL 512651, at *2 (S.D.N.Y. Feb. 15, 2012). Those factors are: (1) the number of shares purchased; (2) the number of net shares purchased; (3) the total net funds expended during the class period; and (4) the plaintiffs' approximate losses. *Id.* The fourth factor is the most important. *Id.*

The parties have presented the Court with conflicting calculations of who has the greatest losses. All movants other than the Zhangs agree that the BABA has the greatest losses group if its members' losses are aggregated.

Notwithstanding the Zhangs' claims to the contrary, I agree with the majority of the movants that, if the BABA group investors' losses are aggregated, then the BABA group's losses are the largest.

The Zhangs' claim to have the largest loss relies on calculations that artificially inflate their losses in two ways.

9

First, the Zhangs' calculations include as "losses" sales that the Zhangs made *before* the January 28, 2015 revelation that SAIC was publicly accusing Alibaba of illegal activity.  Under *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336 (2005) and its progeny, "any losses that [a plaintiff] may have incurred before [a defendant's] misconduct was ever disclosed to the public are not recoverable, because those losses cannot be proximately linked to the misconduct at issue in th[e] litigation." *In re Comverse Tech., Inc. Sec. Litig.*, No. 06 Civ. 1825 (NGG) (RER), 2007 WL 680779, at * 4 (E.D.N.Y. Mar. 2, 2007), *adhered to on reconsideration,* No. 06 Civ. 1825 (NGG) (RER), 2008 WL 820015 (E.D .N.Y. Mar. 25, 2008).

The Zhangs discount *Dura* as a merits decision that should not control at this stage of the litigation, but they mistake its import.  If a loss is not *Dura* eligible then it is not redressable through the putative class action the Zhangs seek to lead.  If a lead plaintiff movant cannot recover a given loss in the action he seeks to lead, the loss cannot logically contribute to his financial stake in that action.  Thus, in ruling on a lead plaintiff application, Judge Gardephe rejected a request to include trading losses realized from sales prior to a corrective disclosure. *Sallustro v. CannaVest Corp.*, No. 14 CIV. 2900 PGG, 2015 WL 1262253, at *13-14 (S.D.N.Y. Mar. 19, 2015).  I reject the Zhangs' request that I include in my loss analysis any losses suffered prior to January 28, 2015.

The Zhangs' alleged losses are also inflated in that they derive from a "first-in, first out" ("FIFO") accounting method.  Over the years, courts have endorsed various approaches to calculating a plaintiff's approximate losses.  Usually, a court chooses

> between two distinct accounting methods: the 'first-in, first out' ('FIFO') and the 'last-in, first out' ('LIFO') techniques. . . . The FIFO method is often used by courts and the Internal Revenue Service to determine losses for tax purposes. Further, FIFO has historically been the preferred method of calculating losses where shares of stock cannot be identified with any particular lots purchased.

> But more recently, courts have preferred LIFO and have generally rejected FIFO as an appropriate means of calculating losses in securities fraud cases. Moreover,

> in a number of instances where courts have used FIFO to calculate financial loss, they have done so reluctantly. LIFO, by contrast, has been used not only for lead plaintiff calculations, but also to determine compensation amounts for stockholders suffering losses due to securities fraud.
>
> The main advantage of LIFO is that, unlike FIFO, it takes into account gains that might have accrued to plaintiffs during the class period due to the inflation of the stock price. FIFO, as applied by the Pension Fund and others, ignores sales occurring during the class period and hence may exaggerate losses.

*In re eSpeed, Inc. Sec. Litig.*, 232 F.R.D. 95, 100-01 (S.D.N.Y. 2005) (internal quotations and

citations omitted). Thus,

> most courts have adopted LIFO and have 'generally rejected FIFO as an appropriate means of calculating losses in securities fraud cases' because LIFO, unlike FIFO, takes into account any gains that plaintiffs may have realized during the class period through sales of stock when the price allegedly was inflated. LIFO also more accurately reports profits or losses for investors who make identical trades during the class period, but who had different initial holdings.

McLaughlin on Class Actions § 4:34 (11th ed.).  I adopt LIFO as the proper approach.

Using the LIFO method to analyze losses the Zhangs suffered prior to January 28, 2015

(i.e., *Dura* eligible losses), yields the result that the Zhangs lost $720,722. (*See* Docket #37 at 19.)

That places them within the following hierarchy of loss, as calculated by the BABA group:

| Movant | *Dura* Recoverable Losses Using LIFO Accounting |
|---|---|
| BABA Investor Group in Aggregate | $2,374,037.08 |
| CAC and Tai | $2,234,402.00 |
| CAC | $1,400,000.00 |
| BABA Investor Robert Kegley Individually | $757,292.86 |
| Tai | $834,402.00 |
| The Zhangs | $720,722.00 |

*Id.*

Because I reject the FIFO accounting method and adhere to *Dura*, there is no meaningful dispute that the BABA group has the largest collective losses.

There is, however, a substantial question whether the individuals comprising the BABA group should be permitted to aggregate their losses in order to become the "biggest loser" for purposes of the lead plaintiff analysis.

### 1. The BABA Group is Plainly a Creation of Counsel; Its Members' Losses Will Not Be Aggregated.

"One of the principal legislative purposes of the PSLRA was to prevent lawyer-driven litigation." *In re Tarragon Corp. Sec. Litig.*, No. 07 Civ. 7972, 2007 U.S. Dist. LEXIS 91418, at *4 (S.D.N.Y. Dec. 6, 2007). The PSLRA permits multiple putative class members to be appointed as lead plaintiffs. *See* 15 U.S.C. § 78u-4(a)(3)(B)(i). However, "The prevailing position is that unrelated investors may join together, with review 'on a case-by-case basis,' [only] 'if such a grouping would best serve the class.'" *In re CMED Sec. Litig.*, 11 Civ. 9297 (KBF), 2012 U.S. Dist. LEXIS 47785, at *7 (S.D.N.Y. Apr. 2, 2012) (quoting *Varghese v. China Shenghuo Pharm. Holdings, Inc.*, 589 F. Supp. 2d 388, 392 (S.D.N.Y. 2008)). Many courts – including this one – have turned away pastiche plaintiffs whose grouping appears to be solely a product of the litigation, because, "To allow an aggregation of unrelated plaintiffs to serve as lead plaintiffs defeats the purpose of choosing a lead plaintiff." *In re Donnkenny Inc. Sec. Litig.*, 171 F.R.D. 156, 157 (S.D.N.Y. 1997); *see also Glauser v. EVCI Ctr. Colleges Holding Corp.*, 236 F.R.D. 184, 188, 190 (S.D.N.Y. 2006) (McMahon, J.) (rejecting a proposed lead plaintiff group that "appear[ed] to be nothing more than a lawyer-created group of unrelated investors who were cobbled together.") (quoting *In re Veeco Instruments, Inc.*, 233 F.R.D. 330, 334 (S.D.N.Y. 2005) (rejecting "amalgamated" groups of unrelated persons who band together in the hope of thereby becoming the biggest loser for PSLRA purposes)); *In re Razorfish Inc., Securities*

12

*Litig.*, 143 F. Supp. 2d 304, 309 (S.D.N.Y. 2001) ("In short, under any analysis, the [unrelated group] does not merit appointment as lead plaintiff.").

Judge Marrero's decision in *Varghese v. China Shenghuo Pharm. Holdings, Inc.*, 589 F. Supp. 2d 388, 392 (S.D.N.Y. 2008) is instructive. *See also In re Bank of Am. Corp. Sec., Derivative & ERISA Litig.*, 258 F.R.D. 260, 270 (S.D.N.Y. 2009). *Varghese* phrases the overarching question as whether "the unrelated members of a group will be able to function cohesively and to effectively manage the litigation apart from their lawyers." *Id.* at 392. The factors courts have recognized as relevant to that analysis include:

> (1) the existence of a pre-litigation relationship between group members; (2) involvement of the group members in the litigation thus far; (3) plans for cooperation; (4) the sophistication of its members; and (5) whether the members chose outside counsel, and not vice versa.

*Id.*

The *Varghese* factors do not favor the BABA group. The BABA plaintiffs effectively admit to having no pre-litigation relationship, having been introduced to each other "through our counsel." (*See* Docket 30-4). Their only involvement in the litigation thus far appears to have been a single conference call. (*Id.*)

The BABA plaintiffs do appear to be quite sophisticated. Richard Kegley is a retired insurance agent and has invested personal funds for 40 years. Marc Phillips is a retired pilot who has invested personal funds for 30 years, investing in options for ten years. Thomas Wood is a professor at Pennsylvania State University and has engaged in personal investing for 30 years. Daniel Hurt is now retired from the auto body shop business, completed a year of college, and has engaged in personal investing for 30 years. Richard Adray is a retired businessman with 30 years of investment experience. John Sorensen is the President and CEO of various nursing facilities; he has 20 years of investing experience.

Their plans for cooperation include regular communication and agreement on a decision-making process in which they will "endeavor to make all decisions unanimously, or where unanimity is not possible . . . with a vote weighted based on the degree of individual loss." (*Id.*) It is proper for courts to inquire into the depth and practicality of this planning process. In *Pipefitters Local No. 636 Defined Benefit Plan*, 275 F.R.D. at 191–92, the Court noted that, "although the [proposed members of a lead plaintiff group] have submitted a joint declaration stating that they have discussed 'protocols for managing the litigation' and 'have implemented communication procedures to enable [them] to confer via phone and/or email,' these conclusory assurances do not satisfy this Court that the Funds Group will be able to effectively manage this litigation." Here, it appears to have taken five days for these sophisticated and apparently busy individuals even to sign their joint declaration. *See* Docket #30-4. I find the BABA plaintiffs' showing regarding this factor to be neutral at best.

As to the fifth factor, however, there is no evidence that the members chose counsel, rather than vice versa. *Compare In re CMED Sec. Litig.*, 2012 U.S. Dist. LEXIS 47785, at *16–17 (noting that the paragraph stating "[i]n consultation with our counsel, we agreed to proceed together because we . . . would like the opportunity to participate in this action as Lead Plaintiffs," led the court to find that the group's aggregation was lawyer-driven and thus, inappropriate for appointment as a lead plaintiff); with ECF No. 30-4, Ex. D, ¶2 ("*We were introduced to each other through our counsel.* We chose to join this group in an effort to best represent the Class with knowledgeable shareholders at the helm to oversee Class counsel in this case. We are committed to and believe we will provide excellent representation of the Class.") (emphasis added).

On the whole, no matter how experienced or sophisticated these plaintiffs may be, the BABA Investor Group "appears to be nothing more than a lawyer-created group of unrelated investors who were cobbled together 'in the hope of thereby becoming the biggest loser for PSLRA purposes,'"

14

a tactic of which this Court has expressed disapproval repeatedly. *Glauser*, 236 F.R.D. at 190. "To allow lawyers to designate unrelated plaintiffs as a 'group' and aggregate their financial stakes would allow and encourage lawyers to direct the litigation. Congress hoped that the lead plaintiff would seek the lawyers, rather than having the lawyers seek the lead plaintiff." *In re Donnkenny Inc.*, 171 F.R.D. at 158.

The BABA plaintiffs' losses will, therefore, not be aggregated for purposes of the lead plaintiff analysis. "Nothing before this Court indicates that these random cumulations of plaintiffs are anything more than an effort to achieve the highest possible 'financial interest' figure to be chosen, which, however also cumulates case control problems and rival disagreements, resulting in delay and increased expense. I reject this approach as essentially inconsistent with the intention of the PSLRA." *In re Doral Fin. Corp. Sec. Litig.*, 414 F. Supp. 2d 398, 401 (S.D.N.Y. 2006); *In re Pfizer Sec. Litig.*, 233 F.R.D. 334, 337 (S.D.N.Y. 2005) (same). (S.D.N.Y. 2005) (same).

*2. Tai and CAC Have the Largest Financial Interest in This Litigation.*

With the BABA group disaggregated, the movant with the largest financial stake in this action is – under any analysis – CAC, either with or without the individual holdings of its sole shareholder, Tai. Indeed, with the BABA group disaggregated, BABA's own calculations make CAC alone the movant with the largest financial stake, followed by BABA investor Kegley, with Tai individually coming in at a close third. (*See* Docket # 45 at 7-8.) Of course, CAC and Tai now seek to proceed together.

The competing movants object that Tai and CAC should not be allowed to aggregate their losses because they did not file a joint motion prior to the PSLRA's strict deadline to file motions for appointment as lead plaintiff within 60 days of class notice. In this case, that deadline closed on March 31, 2015. Tai and CAC filed their initial competing bids before that date, but did not consolidate their candidacy until after the deadline.

15

It is true that two other courts have found that belated consolidation is untimely and must be rejected. *In re XM Satellite Radio Holdings Sec. Litig.*, 237 F.R.D. 13, 19 (D.D.C. 2006), considered whether movants who withdrew their initial motions and then – after the 60-day filing limitation – joined forces with a competing movant. The court rejected the belated consolidation, in part because it:

> runs afoul of the strict deadlines imposed by the PSLRA, which require the filing of a motion for lead plaintiff within 60 days after notice is given. For, as observed by the court in *In re Vaxgen Securities Litigation,* No. C03–1129 (JSW), 2004 U.S. Dist. LEXIS 29812 (N.D. Cal. Apr. 14, 2004), '[a]llowing potential lead plaintiffs to manipulate the size of their financial loss by . . . adding additional persons to a 'group' in supplemental filings . . . would effectively render the strict timeliness set forth in the PSLRA meaningless, and would nullify Congress' attempt to expedite the lead plaintiff appointment process.' *Id.* at *16 (internal citation and quotation marks omitted); *see also In re Enron Corp. Sec. Litig.*, 206 F.R.D. 427, 455 (S.D. Tex. 2002).

*In re XM Satellite Radio Holdings Sec. Litig.*, 237 F.R.D. 13, 19 (D.D.C. 2006); *see also Ferrari v. Gisch*, 225 F.R.D. 599, 603 (C.D. Cal. 2004) (rejecting as untimely joint memorandum of two otherwise unrelated movants filed after 60-day deadline).

Nevertheless, the concerns animating the courts that have rejected untimely consolidations are not present here. Those courts have been concerned with the same principle that required the disaggregation of the BABA group: unrelated litigants should not be allowed to engage in unseemly jockeying for the position of biggest loser. *See id.*

Tai and CAC are not unrelated litigants who – having seen that their own financial stakes are too small to succeed – joined with strange bedfellows. Rather, they are a man who has lost a substantial sum of money in his individual capacity, and a company wholly owned and controlled by him, which lost even more. Unlike the litigants whose belated attempts at consolidation have been rejected, Tai and CAC were not *joined* in the hope of maximizing the chance of being appointed lead plaintiff, but rather were mistakenly *disaggregated* in the first instance. Aggregating Tai and CAC does not lead to any apparent prejudice to the class, or to any competing movant – all of whom pointed out, to some

16

extent, Tai and CAC's error before Tai and CAC did – or to the Defendants – who have informed the
Court that they take no position as to who should be lead plaintiff. And it recognizes the reality that
Tai himself controls CAC and will be driving the bus in any event.

In sum, these facts present a strong case for permitting the late consolidation, in that CAC
and Tai submitted timely motions, and their post-deadline bid for consolidation is merely the
recognition of a natural grouping.

Thus, I follow Judge Batts' analysis in *Schulman v. Lumenis, Ltd.*, No. 02 CIV. 1989 (DAB),
2003 WL 21415287, at \*4 (S.D.N.Y. June 18, 2003), in which she permitted plaintiffs "who had
all already filed timely [individual] motions within the 60-day period" to file an amended motion
outside of the 60-day deadline in order to consolidate their bids. *See id.* (collecting cases); *see also
Reitan v. China Mobile Games & Entm't Grp., Ltd.*, No. 14-CV-4471 KMW, 2014 WL 6491433,
at \*7 (S.D.N.Y. Nov. 20, 2014) (collecting cases); *In re XM Satellite Radio Holdings Sec. Litig.*,
237 F.R.D. 13, 20 (D.D.C. 2006) ("in rare circumstances, that movants may combine to achieve
the largest financial interests after the 60–day deadline") (citing *In re Able Labs. Sec. Litig.*, 425
F. Supp. 2d 562 (D.N.J. 2006) (same)).

This is the "rare" circumstance justifying such a combination.

### 3. Tai and CAC Have Made the Requisite Preliminary Showing of Typicality and Adequacy Under Rule 23.

Once the court " 'identifies the plaintiff with the largest stake in the litigation, further
inquiry must focus on that plaintiff alone and be limited to determining whether he satisfies the
other statutory requirements.' " *Sofran v. LaBranche & Co.*, 220 F.R.D. 398, 402 (S.D.N.Y. 2004)
(quoting *In re Cavanaugh,* 306 F.3d 726, 732 (9th Cir. 2002). Indeed, the Ninth Circuit has

17

observed that a district court's belief that "another plaintiff may be 'more typical' or 'more adequate' is of no consequence. So long as the plaintiff with the largest losses satisfies the typicality and adequacy requirements, he is entitled to lead plaintiff status, even if the district court is convinced that some other plaintiff would do a better job." *In re Cavanaugh*, 306 F.3d at 732; *see also In re Cendant Corp. Litig.*, 264 F.3d 201, 262 (3d Cir. 2001) ("Once the court has identified the movant with 'the largest financial interest in the relief sought by the class,' it should then turn to the question whether that movant 'otherwise satisfies the requirements of Rule 23 of the Federal Rules of Civil Procedure'...."); *Schulman,* 2003 WL 21415287, at *4–6 (commenting that the Second Circuit "has not ruled whether the requirements of the most adequate plaintiff presumption are to be applied serially in order, or whether each requirement is applied to the motion or complaint despite its inability to satisfy all of the presumption's requirements," but applying the requirements in sequence).

Rule 23(a) of the Federal Rules of Civil Procedure provides that a party may serve as a class representative only if the following four requirements are satisfied: (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

Fed.R.Civ.P. 23(a).

"Of the four prerequisites to class certification, only two—typicality and adequacy—directly address the personal characteristics of the class representative." *Pirelli Armstrong Tire Corp. Retiree Med. Benefits Trust v. LaBranche & Co.*, 229 F.R.D. 395, 411-12 (S.D.N.Y. 2004).

Thus, in deciding a motion to serve as lead plaintiff, "The moving plaintiff must make only a preliminary showing that the adequacy and typicality requirements under Rule 23 have been met." *Weinberg v. Atlas Air Worldwide Holdings, Inc.*, 216 F.R.D. 248, 252 (S.D.N.Y. 2003) (citing *In re Crayfish,* 2002 WL 1268013, at *4; *Weltz,* 199 F.R.D. at 133). "In fact, a 'wide ranging analysis under Rule 23 is not appropriate [at this initial stage of the litigation] and should be left for consideration of a motion for class certification.' " *Weinberg,* 216 F.R.D. at 252 (quoting *In re Party City Sec. Litig.,* 189 F.R.D. 91, 106 (D.N.J. 1999)).

Tai and CAC have made the "preliminary showing" of adequacy and typicality required under Rule 23.

The adequacy requirement is satisfied where: 1) class counsel is qualified, experienced, and generally able to conduct the litigation; 2) the class members' interests are not antagonistic to one another; and 3) the plaintiff has sufficient interest in the outcome of the case to ensure vigorous advocacy. *Weinberg*, 216 F.R.D. at 253 (citing *Weltz,* 199 F.R.D. at 133).

To attack Tai and CAC's adequacy, the competing movants focus on the fact that Tai and CAC are controlled by the same person, who initially retained two separate law firms to file separate motions for lead plaintiff status while failing to tell either of the other bid.

The competing initial filings do raise some questions. Another court considering a plaintiff who sent his lead-plaintiff certification to the firm of a competing proposed lead plaintiff noted that, "Such a blatant gaffe does not bode well for the adequacy of his group to lead this litigation." *Tsirekidze v. Syntax-Brillian Corp.*, No. CV-07-2204, 2008 WL 942273, at *4 (D. Ariz. Apr. 7, 2008). But I do not think that this *was* a gaffe; I think it was a strategic miscue.

The competing movants accuse Tai and CAC of, at the very least, confusion as to the function and purpose of the lead plaintiff. More seriously, they point out that, in Tai's Memorandum of Law in Support of his Lead Plaintiff Motion, he represented that he himself had the

19

largest financial interest in this litigation, with losses of $907,025. *See* ECF No. 17. Yet Tai himself was also behind CAC's assertion in its competing filing that it had the purportedly larger financial interest of $1,442,450. *See* ECF No. 15-3. They argue that this discrepancy, combined with Tai's failure to tell either firm that he had retained two firms, implicates the principle that, "Honesty and trustworthiness are [ ] relevant factors in determining [an] individual's ability to serve as a class representative." *Xianglin Shi v. SINA Corp.*, 2005 U.S. Dist. LEXIS 13176, at *14 (S.D.N.Y. July 1, 2005); *CE Design Ltd. v. King Architectural Metals, Inc.*, 637 F.3d 721, 726 (7th Cir. 2011) ("A named plaintiff who has serious credibility problems or who is likely to devote too much attention to rebutting an individual defense may not be an adequate class representative.").

More broadly, Tai and CAC's competitors argue that Tai and CAC's approach to the litigation thus far undermines his assertion that he wishes to undertake the fiduciary duties of a Lead Plaintiff. Tai admitted that he filed two competing applications in the hopes that it would increase his chance of being appointed lead plaintiff, and, having been caught, now proposes to saddle the class with the bills of not one, but two law firms. *See, e.g.*, *Weltz v. Lee*, 199 F.R.D. 129, 134 (S.D.N.Y. 2001) ("The large and convoluted structure proposed could cause exactly the kind of duplication of effort, increased attorneys' fees, friction or lack of coordination among counsel, and concomitant delay in the litigation which the PSLRA was enacted to combat in the first place.").

Tai answers that, in his zeal to be Lead Plaintiff, he made a regrettable mistake that he will not repeat.

Frankly, I view this as a tempest in a teacup. Another court confronted with such a gaffe did not view it as so serious as to preclude the preliminary finding of adequacy necessary at this stage. *See* Docket Sheet, *In Re Altisource Portfolio Solutions, S.A. Securities Litigation*, 14 Civ. 81156 (WPD) (S.D. Fla.) (appointing as lead plaintiff a pension fund that filed two competing motions for lead plaintiff status using two separate firms on the same day, but which later corrected

its mistake).  The competing movants make much of Tai's mistake, but, in the case cited by them, the court found that the movant who had filed competing motions against himself was inadequate for *several* reasons, of which the competing motion gaffe was only one. *See Tsirekidze*, 2008 WL 942273, *passim*.

Tai admits that he made a mistake.  He rectified it.  He seems to care very much about obtaining relief in light of the substantial losses he and his company suffered.  His interests are fully aligned with those of the class.  The competing movants insinuate much from Tai's mistake, but show nothing other than that Tai is an eager – if perhaps a little *over*eager – lead plaintiff.

Next, the competing movants object that CAC does not satisfy the adequacy requirement because a unique defense applies to CAC's PSLRA certification, likely diverting its attention from the interests of the class.  The PSLRA provides that the lead plaintiff cannot be "subject to unique defenses that render such plaintiff incapable of adequately representing the class." 15 U.S.C. §78u 4(a)(3)(B)(iii)(II)(bb); *see also Scott v. N.Y. City Dist. Council of Carpenters Pension Plan*, 224 F.R.D. 353, 357 (S.D.N.Y. 2004) (finding that "a defense unique to a named plaintiff" "can bar a finding of adequacy, even if that defense would not ultimately defeat that particular class representative's claim").

The unique defense to which CAC is purportedly subject relates to its PSLRA certification.[2]  The PSLRA requires "[e]ach plaintiff seeking to serve as a representative party on behalf of a class [to] provide a sworn certification . . . personally signed by such plaintiff and filed with the complaint, that . . . states that the plaintiff has reviewed the complaint and authorized its filing." 15 U.S.C. § 78u–4(a)(2)(A).  Here, Tai filled out the certification using the first person

---

[2] Wong and Lee originally suggested that Tai himself might have a conflict with the class because of a prior investment, but that suggestion apparently was based on a case of mistaken identity, in that the movant William Tai is not the same person as the prominent angel investor Bill Tai.

singular, for example, certifying that "I . . . have reviewed the complaint," and that "I did not engage in transactions . . . I am willing to serve as a lead plaintiff . . ." (Docket #15-2 at 2.)  He noted that he was CAC's "sole director" but did not otherwise indicate that he had the authority to execute the certification on CAC's behalf.

Some courts have rejected lead plaintiff applications on the ground that the relevant PSLRA certification lacks any indication that its signatory had the requisite authority. *Steamfitters Local 449 Pension Fund v. Cent. European Distrib. Corp.*, No. 11-6247 (JBS/KMW), 2012 U.S. Dist. LEXIS 118693, at *34-36 (D.N.J. Aug. 22, 2012) rejected a movant's application because its certification did not specify that it was executed on behalf of the signatory's subsidiaries. In *In re Enzymotec Ltd. Sec. Litig.*, No. 14-5556, 2015 U.S. Dist. LEXIS 25720, at *6–10 (D.N.J. Mar. 3, 2015), the court found that the presumption in favor of lead plaintiff movant 3B Communications ("3B") was "successfully rebutted" where 3B was subject to a unique defense because its certification "provide[d] no indication that its signer . . . is authorized to sign the certification on 3B's behalf." *Id.* at *8–10.

Yet those cases are distinguishable – in them, there was *no* indication that the certification was signed on behalf of the movant.  Not so here.  CAC's certification is signed by Tai *as the sole director* of CAC, and he has submitted a declaration explaining that he is CAC's sole stockowner and has the requisite authority to sign on CAC's behalf.  The Court in *Roby v. Ocean Power Techs., Inc.*, No. 14-cv-3799 (FLW) (LHG), 2015 WL 1334320, at *8-*9 (D.N.J. Mar. 17, 2015) considered similar facts where a movant's initial certification stated that "I, Wieland Kreuder, Director of FiveT Capital AG, as investment manager for FiveMore Special Situations Fund Ltd., duly certify and say . . ." and proceeded to make certifications in the first person singular. *Id.* at *7.  The court found that no "unique defense" precluded FiveMore's bid for lead plaintiff status, finding that a supplemental certification clarifying that the individual signer was acting in his capacity as an agent of the entity was sufficient to remedy any purported deficiencies. *Id.*  Here, Tai has submitted

22

a declaration clarifying that he signed in his capacity as the director and sole shareholder of CAC, and had the authority to do so. I see no deficiency in CAC's certification, particularly as amended by his declarations.

Even if there were an error in the certification, however, "minor or inadvertent mistakes made in a sworn certification do not strike at the heart of Rule 23's adequacy requirement." *Niederklein v. PCS EdventuresA.com*, Inc., No. 1:10-CV-00479, 2011 WL 759553, at *11 (D. Idaho Feb. 24, 2011) (citing *Ferrari*, 225 F.R.D. at 605 (holding that relatively minor miscalculations of losses suffered by the presumptive most adequate plaintiff were not a legitimate basis for disqualification for lead plaintiff appointment)); *Chill v. Green Tree Financial Corp.*, 181 F.R.D. 398, 410–11 (allowing presumptive most adequate plaintiff group to supplement certifications in order to correct technical deficiencies)). The failure to correct obvious or inconsequential clerical errors, like the ones at issue, simply is not the type of adequacy issue that would "divert the fact finders' attention from the merits and thus infect the claims of the class as a whole." *Dubin v. Miller*, 132 F.R.D. 269, 272 (D. Colo. 1990).

I turn now to the typicality requirement. Typicality is satisfied when the moving plaintiff's injuries arose from the same course of conduct of the defendant that injured the other class members. *Weinberg v. Atlas Air Worldwide Holdings, Inc.*, 216 F.R.D. 248, 253 (S.D.N.Y. 2003) (citing *In re Crayfish,* 2002 WL 1268013, at *5). "It is important to note, however, that the Lead Plaintiff's claims do not have to be identical to the other class members' claims." *Id.*

No one objects that Tai or CAC's claims fail to satisfy the typicality requirement. Nor could they; Tai and CAC's losses appear to be entirely typical of the proposed class's losses.

In sum, Tai and CAC have the largest financial stake in this litigation, and have made the showings of adequacy and typicality under Rule 23 that are required at this stage of the litigation.

I find Tai and CAC – acting as co-lead plaintiffs – to be the most adequate lead plaintiff here.

23

### *BABA and the Zhangs' Requests for Discovery under 15 U.S.C. § 78u-4(a)(3)(B)(iv)*

The PSRLA provides that, for purposes of appointing a lead plaintiff,

> discovery relating to whether a member or members of the purported plaintiff class is the most adequate plaintiff may be conducted by a plaintiff only if the plaintiff first demonstrates a reasonable basis for a finding that the presumptively most adequate plaintiff is incapable of adequately representing the class.

15 U.S.C. § 78u-4(a)(3)(B)(iv). The Zhangs and the BABA group have invoked that provision to request expedited discovery into "(1) [Tai's] identity and retention of competing law firms to serve as Lead Counsel; (2) [Tai's] ownership of Christine Asia and his authority to sign the PSLRA certification on its behalf; and (3) [CAC's] standing as a class member to pursue these claims." (Docket #36 at 19).

I see no reason to grant that discovery. As I have recounted, Tai and CAC have made the requisite preliminary showings of adequacy to be co-lead plaintiffs. Moreover, I see little to be found out in such discovery; Tai has explained his mistake, his counsel's initial lack of knowledge that any other counsel had been retained, and the circumstances leading to those events. He has submitted sworn statements to this court averring that he wholly owns and controls CAC. Further, CAC's "standing" is not in issue. If the parties are not familiar with the Supreme Court's decision in *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, ___ U.S. ___, 134 S. Ct. 1377, 1388 n. 4 (2014), which counsels that courts and litigants should use the term "standing" only in reference to Article III of the Constitution, they should become so.

### *The Other Movants*

None of the other movants has a financial interest in this litigation as large as Tai and CAC's. Because a movant's financial stake in the litigation is the single most important factor to consider, and because I find that no one has rebutted the presumption that Tai and CAC are the most adequate plaintiff, I need go no further.

24

I note, however, that while Wong and Lee's interest is too small to place them into contention for appointment as lead plaintiff, their submissions were genuinely helpful.

## III.    CAC's Chosen Counsel, the Rosen Firm, is Appointed as Lead Counsel.

The PSLRA vests authority in the lead plaintiff to select lead counsel, subject to approval by the Court. 15 U.S.C. § 78u-4(a)(3)(B)(v). Thus, "While the appointment of counsel is made subject to the approval of the court, the Reform Act clearly leaves the choice of class counsel in the hands of the lead plaintiff." *In re Cavanaugh*, 306 F.3d at 734 (internal citations omitted). "Thus, the Court should not disturb the lead plaintiff's choice of class counsel unless 'necessary to protect the interests of the class.'" *In re Nortel Networks Corp.*, No. 01-CV-1855(RMB), 2002 WL 1492116, at *1 (S.D.N.Y. Feb. 4, 2002) (quoting Statement of Managers, "The Private Securities Litigation Reform Act of 1995," 141 Cong. Rec. H13691–08, at H13700).

Here, Tai spent several weeks vetting different firms for himself and for CAC. For CAC, which has the larger financial stake, he chose the Rosen firm; for himself, he chose the Glancy firm. The Court is aware that the Glancy and Rosen firms previously have worked together as co-lead counsel. However, there is no need for co-lead counsel in this case. Tai individually and on behalf of CAC apparently believed that one law firm was sufficient when the original motions were filed, and – with respect to the interests of the *class* as opposed to the attorneys – there is no reason to disturb that initial assessment. To the contrary, the mushrooming presence of ever-more attorneys in a case more often serves to delay than to expedite the just and efficient administration of justice. It also tends to increase costs. Where, as here, there is no demonstrable need for more than one law firm to represent the class, it is proper to reject a request to appoint co-lead counsel. *See Weltz v. Lee*, 199 F.R.D. 129, 134 (S.D.N.Y. 2001) (citing *In re Baan Co. Sec. Litig.,* 186 F.R.D. 214, 230–1 (D.D.C.1999) and *In re Oxford Sec. Lit.*, 182 F.R.D.42, 42 (S.D.N.Y. 1998)). I do so now.

The Rosen firm was the counsel initially chosen to represent the entity with the single largest stake in this litigation, CAC. As set forth in its papers and at the April 24, 2015 conference, the Rosen firm has extensive experience navigating the particular complexities of litigation with Chinese companies that may claim a state secrets privilege. Moreover, in contrast to every other firm that appeared before this Court at the April 24, 2015 conference, the Rosen firm employs fluent Chinese speakers.

I appoint the Rosen firm -- and it alone -- as lead counsel.

## IV.    The Proposed Options SubClass

There was, amidst the voluminous lead plaintiff briefing, a proposed subclass of options purchasers. However, that request is no longer before the court.

In a motion that has otherwise been withdrawn, movant and putative class member Gang Liu proposed a subclass of options purchasers. In its briefing, the BABA group suggested that, if the Court were to certify an options sub-class, it would be most appropriate to name as lead plaintiff a BABA group investor who purchased options and suffered greater losses than Mr. Liu: Marc Phillips.

Mr. Liu did not appear at the April 24, 2015 hearing. The BABA Group did appear, and took the position that there was no need to certify a subclass of options purchasers at this time.

I agree. Under the PSLRA, "The fact that plaintiffs might have different types of securities does not require a separate class or co-lead plaintiffs because lead plaintiffs need not satisfy all elements of standing with respect to the entire lawsuit under the PSLRA." *Averdick v. Hutchinson Tech. Inc.*, 2006 U.S. Dist. LEXIS 47445, at *18 (D. Minn. Feb. 9, 2006) (citing *In re Salomon Analyst Level 3 Litig.*, 350 F. Supp. 2d 477, 498 (S.D.N.Y. 2004)); *In re Cendant Corp. Litig.*, 182 F.R.D. 144, 148 (D.N.J. 1998). If pre-trial discovery reveals rifts within the class that require subclasses, the issue will be addressed at that time. *See In re Oxford Health Plans, Inc. Sec. Litig.*,

26

182 F.R.D. 42, 51 (S.D.N.Y. 1998); Fed.R.Civ.P. 23(c)(1)(c) (court may alter or amend certification order at any time before final judgment); 23(c)(5) (court may divide certified class into subclasses, each to be treated as a separate class under Rule 23); *also see generally Sumitomo Copper Litig. v. Credit Lyonnais Rouse, Ltd.*, 262 F.3d 134, 139 (2d Cir. 2001) ("[T]he district court is often in the best position to assess the propriety of the class and has the ability . . . to alter or modify the class, create subclasses, and decertify the class whenever warranted.").

## CONCLUSION

For the foregoing reasons, civil actions 15 Civ. 00759, 15 Civ. 00811, 15 Civ. 00991, and 15 Civ. 01405 are consolidated for all purposes. Movants Tai and CAC are appointed as co-lead plaintiffs in those actions; and the Rosen firm is appointed as lead counsel. The Clerk of the Court is directed to remove Docket Nos. 11, 14, 16, 19, 20, 25, and 28 from the Court's list of pending motions.

Dated: May 1, 2015

_____
U.S.D.J.

BY ECF TO ALL COUNSEL